# IN THE COURT OF APPEALS OF IOWA

———————————

No. 26-0189
Filed May 27, 2026

———————————

**In the Interest of J.M., Minor Child,**

**S.A., Mother,**
Appellant.

———————————

Appeal from the Iowa District Court for Dallas County,
The Honorable Virginia Cobb, Judge.

———————————

**AFFIRMED**

———————————

Chira L. Corwin of Corwin Law Firm, Des Moines,
attorney for appellant mother.

Brenna Bird, Attorney General, and Natalie Hedberg, Assistant Attorney
General, attorneys for appellee State.

Donna Schauer of Schauer Law Office, Panora,
attorney and guardian ad litem for minor child.

———————————

Considered without oral argument
by Tabor, C.J., and Chicchelly and Langholz, JJ.
Opinion by Tabor, C.J.

1

**TABOR, Chief Judge.**

The juvenile court terminated the mother's parental rights to her eleven-month-old son, J.M., under Iowa Code section 232.116(1) (2025), paragraphs (e) and (g). She appeals, arguing (1) the State failed to prove the grounds for termination, (2) termination wasn't in J.M.'s best interests, and (3) the court should give her six more months to work toward reunification. On our review, the State proved the grounds for termination and that termination was in the child's best interests, and the record does not support giving the mother more time. So, we affirm.[1]

## I.      Facts and Prior Proceedings

J.M., born in March 2025, is the fifth child in this family to be removed from his mother's care. All five children tested positive for illegal substances at birth. Those circumstances led to juvenile court intervention and years of services to help the mother address her addictions. The mother entered substance-use treatment programs five times but hasn't maintained her sobriety. In this and previous child-in-need-of-assistance (CINA) cases, she has been inconsistent in drug testing or has tested positive. When newborn J.M. tested positive for THC, the juvenile court removed him from parental custody, placing him first with fictive kin and later with a foster family who adopted J.M.'s sibling. J.M. has no significant health or developmental concerns and has been doing well in his placement.

Beyond the mother's substance use, other parenting deficiencies troubled the Iowa Department of Health and Human Services and the court during the earlier CINA cases, beginning in 2018. For example, one child,

---

[1] The juvenile court also terminated the father's parental rights; he does not appeal.

aged four, was found wandering outside by herself, resulting in a founded child abuse assessment and removal of the two eldest children. While they were out of her custody, the mother had three more children—in 2023, 2024, and J.M. in 2025—all of whom were removed at birth and never returned to the mother. The department also documented domestic violence in the home, and the mother had long-standing, unaddressed mental-health concerns. The mother also lacked stable housing suitable for children. The court terminated her rights to the three eldest children in 2024.

The mother made little progress in addressing those parenting deficiencies during 2025. Her rights to her fourth child were terminated in October, two months before the termination hearing in J.M.'s case. As for J.M., the juvenile court found that the mother failed to maintain significant and meaningful contact with him and made no reasonable efforts to resume custody. The court also found that despite prior terminations, the mother was unable or unwilling to respond to services to correct the concerns, and delaying permanency would not benefit J.M. In essence, the court found nothing had changed since the last termination order. The mother appeals.

## II.    Analysis

We review the three steps to termination de novo. *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). Generally, we give the juvenile court's factual findings respectful consideration but are not bound by them. *Id.* We address only those steps that are disputed. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

As the first step, the State must prove a statutory ground under Iowa Code section 232.116(1). *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Second, the State must show termination is in the child's best interests under

section 232.116(2). *Id.* at 707. Third, parents may rely on exceptions to termination under section 232.116(3). *Id.* The mother challenges the statutory grounds and best-interests determinations and asks for more time to work toward reunification.

## A. Statutory Grounds for Termination

The juvenile court terminated the mother's parental rights under section 232.116(1), paragraph (e) (failure to maintain significant and meaningful contact) and paragraph (g). When the court terminates on more than one statutory ground, we may affirm on any ground supported by the record. *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012).

Here, we focus on paragraph (g), which requires proof that: (1) J.M. has been adjudicated as a CINA under section 232.96; (2) the court terminated parental rights under section 232.117 with respect to other children in the same family; (3) there is clear and convincing evidence that the mother "continues to lack the ability or willingness to respond to services which would correct the situation"; and (4) "[t]here is clear and convincing evidence that an additional period of rehabilitation would not correct the situation." Iowa Code § 232.116(1)(g).

The mother challenges elements three and four. The gist of her challenge is that the court unfairly ignored her recent progress because of her history of terminations. [2] Our supreme court has pointed out that

---

[2] The mother is rightly upset that parts of this termination order appear identical to the termination order for J.M.'s sibling, sometimes even using the other child's initials. The mother questions whether the juvenile court reviewed this case with "an open mind" given the "copy and paste" ruling. While that drafting is unfortunate, it is likely driven by the intense pressures of juvenile court and the similarity of the facts at this trial, which occurred only two months later. Because we review the record de novo, we are not bound

paragraph (g) "is unique because it is the only ground for termination under chapter 232.116 that requires the juvenile court to find parents have already had their rights terminated to another child who is a member of the same family." *In re J.H.*, 952 N.W.2d 157, 166 (Iowa 2020). It requires the juvenile court to "examine the parents' past termination cases in deciding whether termination is appropriate" now. *Id.* at 167. The State maintains the burden to prove the ground by clear and convincing evidence, "but the parents' history of past terminations—especially when those terminations were under similar circumstances—is highly relevant in proving the parents lack the ability or willingness to respond to services." *Id.* (footnote omitted).

Surveying the previous terminations, we do see areas of progress, for instance when it comes to steady employment. But the mother has not advanced within striking distance of "correct[ing] the situation" that prompted J.M.'s removal. *See* Iowa Code § 232.116(1)(g)(3). Nor will more time for rehabilitation correct the situation. *See id.* § 232.116(1)(g)(4). As the case manager testified, the mother has not made "meaningful changes" to demonstrate her sobriety and safe parenting.

Expanding on that point, the record shows that the mother has yet to demonstrate durable sobriety—even after successful completion of inpatient substance-use treatment. Although she engaged in substance-use outpatient counseling, her attendance dropped off around the time of the October termination. She missed several drug screens in early summer 2025. In September, her counselor reported her recent urinalysis was invalid due to

---

by the juvenile court's factfinding and reach our own legal conclusions. *See Fink v. Lawson*, 30 N.W.3d 582, 591 (Iowa 2026).

suspected tampering. Then in October, she tested positive for marijuana and alcohol and admitted recent drinking.

At the termination hearing, the mother testified that she planned to enter an inpatient facility for women and children, but the facility deferred her entry. But when the case manager contacted the facility, she discovered there was no need to delay entry. So a pattern emerges where the mother engages briefly in substance-use treatment, then loses momentum. She has not prioritized services and continues to make excuses. Thus, the doubts from the first four cases that the mother can respond to substance-use services and establish her sobriety linger now as barriers to reunification. And because of her history of unsuccessful discharges, we are skeptical of the mother's suggestion that she could care for J.M. while in treatment.

Likewise, her housing instability continued. In the prior cases, the mother struggled to show she could provide a safe and stable home environment for her children. That struggle continued in this case, with the mother working to make a house habitable after it was occupied by "squatters" and had no running water.

Worries about the mother's mental health also echo across her CINA cases. True, since J.M.'s removal, the mother had been going to therapy (except for a dip in attendance surrounding the previous termination). Yet the State now highlights her counselor's report that she had "difficulty identifying therapeutic goals" and "expressed ambivalence toward the value of mental-health services." But the counselor attributed this mindset to the mother's "perception of external pressure to attend services and the emotional toll of parental rights termination." We read the counselor's comments as reflecting the mother's frustration with the juvenile court process, not a lack of insight. In fact, the counselor described the mother as

"increasingly receptive to exploring additional coping strategies and exploring healthier outlets." Thus, the counselor's outlook on the mother's response to mental-health treatment was not as bleak as the State argued. That said, being "receptive to exploring" healthier strategies implies the mother is just starting down the right path and doesn't reflect the level of improvement expected after three years of services.

Similarly, the mother's vulnerability to domestic abuse has continued from the earlier CINA cases. She testified that she "addressed" the issue. But she did not meet the department's expectation that she would work with a domestic violence advocate. In one bright spot, the mother had maintained employment at a hotel for around a year and had been offered a promotion. That effort is commendable. But at the same time, her driver's license was suspended after she was charged with operating while intoxicated. And she didn't attend classes offered to improve her parenting.

All told, these lingering safety issues convince us that the mother lacks the ability or willingness to respond to services such that she can correct the concerns. *See* Iowa Code § 232.116(1)(g)(3). We are also convinced that time beyond the three years of services already received won't allow her to correct the situation. *See id.* § 232.116(1)(g)(4).

**B. Best Interests**

The mother next contends that termination of her rights was not in J.M.'s best interests. In assessing best interests, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." *In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021) (quoting Iowa Code § 232.116(2)). We also consider J.M.'s

integration into his foster home with his sibling. *See* Iowa Code § 232.116(2)(b).

To her credit, the mother has consistently attended visits with J.M. and performed basic infant care. But she has not shown enough stability to provide long-term care for a child. She lost custody of her youngest three children just after their births, and she never had unsupervised care of J.M. The case manager reported that J.M. is bonded with the foster parents and would suffer no harm if the mother's rights are terminated. We agree that J.M.'s needs are best met by severing the parent-child relationship.

### C. Delayed Permanency

Lastly, we consider whether the mother should have more time to reunite with J.M. *See id.* § 232.117(5) (permitting court to deny termination and enter a permanency order under section 232.104). She asks for six more months to participate in services. *See id.* § 232.104(2)(b).

The mother argues the juvenile court should have given more weight to her progress in this case. But to continue placement for six months, section 232.104(2)(b) requires the court to decide "the need for removal will no longer exist at the end of the extension." *In re A.A.G.*, 708 N.W.2d 85, 92 (Iowa Ct. App. 2005). Balancing the history of prior terminations with the commendable but modest progress in the last few months, we cannot make that finding here. We must also consider whether waiting longer for permanency is in the child's best interests. *In re W.T.*, 967 N.W.2d 315, 323 (Iowa 2021); *see also* Iowa Code § 232.116(2). J.M. has never been in the mother's care and is thriving in his current placement. Delaying permanency is not warranted. Rather, J.M.'s best interests are served by termination.

**AFFIRMED.**